## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Colonial Pipeline Company,

               Plaintiff,

v.

AIG Specialty Insurance Company,

               Defendant.

           Case No. 1:19-cv-762-MLB

_____/

AIG Specialty Insurance Company,

               Third-Party
               Plaintiff,

v.

Colony Insurance Company and
CECO Pipeline Services Company,
Inc.,

               Third-Party
               Defendants.

_____/

## <u>OPINION & ORDER</u>

      This is an insurance coverage dispute.  In September 2016, Colonial

discovered a gasoline leak in its petroleum pipeline system.  The leak

caused Colonial substantial damages.  Colonial asked its insurer, AIG, to cover those damages.  AIG said no.  This lawsuit followed.  Colonial and AIG now cross-move for summary judgment on two issues: (1) whether Colonial has exhausted a $10 million self-insured retention ("SIR") in AIG's insurance policy; and (2) whether the AIG policy covers a settlement amount Colonial paid to the Alabama Department of Environmental Management ("ADEM").  (Dkts. 118; 119.)  AIG also moves for summary judgment on a third issue: whether Colonial's coverage under the AIG policy is "excess" of Colonial's coverage under a separate insurance policy issued by Colony. (Dkt. 120.)  The Court grants summary judgment to Colonial on the first issue, grants summary judgment to AIG on the second issue, and denies AIG's motion for summary judgment on the third issue.  The Court also denies a motion to strike filed by Third-Party Defendant CECO.  (Dkt. 125.)

## I.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is particularly suited for cases of insurance coverage because

the interpretation of a written contract is a matter of law to be decided by the court." *Nat'l Specialty Ins. Co. v. ABS Freight Transportation, Inc.*, 91 F. Supp. 3d 1258, 1260 (S.D. Fla. 2014); *see Coating Applicators, Inc. v. U.S. Fid. & Guar. Co.*, 157 F.3d 843, 844 (11th Cir. 1998); *Michna v. Blue Cross & Blue Shield of Georgia, Inc.*, 653 S.E.2d 377, 379 (Ga. Ct. App. 2007).

## II.  Self-Insured Retention

The first issue is whether Colonial has met the $10 million SIR required for coverage under the AIG policy.  The Court finds that it has.  No reasonable jury could conclude otherwise.

An SIR is the amount of loss that an insured must pay out of pocket before coverage kicks in.  *See* Black's Law Dictionary (11th ed. 2019) ("self-insured retention").  The AIG policy includes a $10 million SIR.  It says AIG will "pay covered Loss, in excess of the [$10 million] Self-Insured Retention amount."  (Dkt. 114-5 at 11, 41, 72.)  It is undisputed that Colonial has incurred more than $10 million in covered Loss.  (*See* Dkts. 114-16; 118-1 at 13 n.32; 129-1 ¶¶ 33–38.)  So Colonial has satisfied "the Self-Insured Retention amount" and AIG must now "pay covered Loss[] in excess of" that amount.

AIG claims Colonial does not meet the $10 million threshold if we only count Loss covered on a *primary* basis and ignore Loss covered on an *excess* basis.[1]  (*See* Dkts. 119-1 at 20–21; 129 at 21.)  That may be. (Dkt. 129-1 ¶ 38.)  But it is irrelevant.  Nothing in the policy limits the kind of "covered Loss" that counts towards the SIR.  Any "covered Loss" will do.  The Court cannot add limiting language that is not there.  *See Nat'l Life & Acc. Ins. Co. v. Wilson*, 127 S.E.2d 306, 308 (Ga. Ct. App. 1962) ("[T]he Court by construction cannot . . . add words to the contract of insurance to either create or avoid liability.").  And a Loss covered on an excess basis is still a "covered Loss."  *See Cotton States Mut. Ins. Co. v. Crosby*, 260 S.E.2d 860, 862 (Ga. 1979) ("[T]hough coverage by Cotton States for an unlawful detention would be only in excess of the other insurance in this case, such conduct . . . is covered by this policy.").[2]

AIG counters that this interpretation would create surplusage in the policy.  (*See* Dkts. 129 at 17–18; 134 at 8–9, 11.)  The argument here is a bit convoluted.  But the gist is as follows.  In addition to its AIG

---

[1] Excess coverage means "an insurer will pay a loss only after other available primary insurance is exhausted." *The Am. Cas. Co. of Reading v. MAG Mut. Ins. Co.*, 185 F. App'x 921, 925 n.2 (11th Cir. 2006).

[2] The parties agree that Georgia law governs the AIG policy.  (Dkts. 118-1 at 10 n.25; 129 at 19.)

coverage, Colonial also has insurance with Steadfast Insurance Company. (Dkt. 129-1 ¶¶ 13–14.) The Steadfast policy has a $20 million SIR. (Dkt. 129-1 ¶¶ 13–14.) Coverage under the two policies sometimes overlaps. When it does, AIG's coverage is excess and Steadfast's coverage is primary. (Dkt. 129-1 ¶ 15.) Critically, the AIG policy says that, where AIG and Steadfast both cover the same Loss (meaning AIG's coverage is excess), Colonial need not meet AIG's $10 million SIR once it meets Steadfast's $20 million SIR. (Dkt. 114-5 at 42.)[3] That is, Colonial need not incur $10 million in "covered Loss" (AIG's SIR) once it incurs

---

[3] The actual policy language is more elaborate than this, but it achieves the same result:

> If a Claim covered under the policies listed below in the Schedule of Underlying Insurance [including the Steadfast policy] . . . exhausts the limits of liability of such policy(ies), this Policy will only pay covered Loss in excess of the limits of insurance provided by such policy(ies). In such an event, the Insured will not be required to pay the Self-Insured Retention amount stated in [this Policy] for the applicable coverage.

> Further, any Claim for Loss or Clean-Up Costs resulting from Each Incident covered in the Underlying policies [including the Steadfast policy], is not subject to a separate Self-Insured Retention on this Policy once the current Self-Insured Retention applicable to the underlying coverage has been satisfied.

(Dkt. 114-5 at 42.)

$20 million in *excess*-covered Loss (Steadfast's SIR).  AIG claims this provision would be unnecessary if "covered Loss" already included excess-covered Loss.  After all, $20 million of the latter would always satisfy $10 million of the former.  Why bother saying the $10 million requirement need not be met if, according to other policy provisions, it was met already.

AIG is right, but only up to a point.  It is true that, if excess-covered Loss counts towards the $10 million SIR, the policy's description of how that SIR interacts with the $20 million SIR is not strictly necessary because it is already implicit in other portions of the policy.  But "nothing prevents the parties from using a belt and suspenders approach in drafting [a policy], in order to be doubly sure." *TMW Enterprises, Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 577 (6th Cir. 2010).  Policy language that is not "technically necessary" can still "remind the readers" of other terms or, for clarity, provide a specific application of more general provisions. *Id.* And where it serves those functions, as it does here, it does not violate the rule against surplusage.  *Id.*

"But even if [the Court] choose[s] to label this type of drafting a form of redundancy, . . . that label surely is not a fatal one when it comes

to insurance contracts, including this contract, where redundancies abound." *Id.* Georgia recognizes the anti-surplusage canon. *See Nat'l Cas. Co. v. Georgia Sch. Boards Ass'n-Risk Mgmt. Fund*, 818 S.E.2d 250, 253 (Ga. 2018) ("[A] preferred construction will . . . not render any of the policy provisions meaningless or mere surplusage."). But that canon, like all canons, is not a "mandatory rule." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001). It is a "preference" or "guide" that often yields to other considerations, including "the plain meaning" of the text. *Id.*; *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004). That is particularly true in the insurance context where the canon "needs to be deployed with special care" given the prevalence of lengthy policies filled with "iteration." *Santo's Italian Cafe LLC v. Acuity Ins. Co.*, 15 F.4th 398, 405–06 (6th Cir. 2021). Indeed, "[i]t is no overstatement to say that [a document] would not be an insurance contract if it did not come with some surplusage." *Id.* at 406.

The policy here says AIG must "pay covered Loss, in excess of the [$10 million] Self-Insured Retention amount." This language is unambiguous. It means AIG must pay when Colonial's "covered Loss" exceeds $10 million. The plain meaning of "covered Loss" includes Loss

7

covered on a primary basis *or* an excess basis.  The Court is bound to apply that meaning.  *See Longstreet v. Decker*, 717 S.E.2d 513, 516 (Ga. Ct. App. 2011) ("[I]f the language is clear the contract shall be enforced according to its clear terms.  In fact, no construction is even permitted when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation.").

The weak form of surplusage that AIG identifies cannot override the unambiguous text of the policy.  The text is "too strong to bend." *Chickasaw Nation*, 534 U.S. at 89 (declining to apply surplusage canon). And the alleged surplusage is too minor to worry much about.  It merely makes explicit something that is already implicit in the policy.  It causes no real confusion.  If the Court were to forsake the plain language of the policy to cure such a minor redundancy, it would likely create more ambiguity than it eliminates—a sure sign that the surplusage canon should not control.  *See TMW Enterprises*, 619 F.3d at 578 ("The [surplusage] canon is one among many tools for dealing with ambiguity, not a tool for *creating* ambiguity in the first place.").  "When the policy is clear as written," as it is here, the Court is "bound by the specific language, and will not construe the policy . . . simply to avoid a finding

that there is surplus language in the contract." *Id.* Or, to put it more bluntly, clear language trumps minor surplusage. *See Lamie*, 540 U.S. at 536 ("We should prefer the plain meaning" over an alternative meaning that eliminates surplusage). Especially in the insurance context. Because the clear language of the AIG Policy means Colonial has met the $10 million SIR, Colonial is entitled to summary judgment on that issue.

## III. ADEM Lawsuit

The second issue is whether the AIG policy covers a settlement amount that Colonial paid to resolve an ADEM lawsuit arising out of the gasoline leak. Everyone agrees the settlement could only be covered if the ADEM lawsuit constitutes a "Possible Claim" under the policy. (*See* Dkts. 118-1 at 18–19, 22; 126 at 19–20; 136 at 11.) Colonial says the lawsuit does constitute a Possible Claim. AIG says it does not. The Court agrees with AIG. A reasonable jury would as well.

Colonial discovered the gasoline leak in September 2016. (Dkt. 129-1 ¶ 2.) ADEM sued Colonial over the leak in March 2018. (Dkt. 114-3.) That was well after the AIG policy had expired. (Dkt. 134-2 ¶ 62.) Thus, the lawsuit was not a covered "Claim" under the policy because it was not

made and reported "during the Policy Period."  (Dkt. 114-5 at 13–14.)
Everyone acknowledges that.  (Dkt. 136 at 11.)  But the policy also covers
*Possible* Claims to the extent they are reported during the policy period
and later ripen into actual Claims.  (Dkt. 114-5 at 19.)  "[A] Possible
Claim means a Pollution Condition that first commenced on or after the
Inception Date that the Insured reasonably expects may result in a
Claim." (Dkt. 114-5 at 30.)  Colonial argues the ADEM lawsuit falls into
this definition.  And that may be true.  But it is not dispositive here
because the policy carves out an exception to the "Possible Claim"
definition.  And ADEM's lawsuit falls squarely within that exception.

The exception says "Possible Claim shall not include a Pollution
Condition that results in a Claim during the Policy Period." (Dkt. 114-5
at 30.)  This language applies here.  Colonial's gasoline leak constitutes
a "Pollution Condition" because it involved "[t]he discharge, dispersal,
release or escape" of a "liquid, gaseous or thermal irritant or
contaminant."  (Dkt. 114-5 at 29.)  ADEM's lawsuit "include[d]"
allegations about that Pollution Condition.  (*See* Dkts. 114-3 ¶¶ 1, 19–
30; 134-2 ¶¶ 28, 33.)  The same Pollution Condition "result[ed]" in a
Notice of Federal Interest from the United States Environmental

10

Protection Agency ("EPA").  (Dkt. 134-2 ¶¶ 13–14.)  Everyone agrees the Notice constituted a "Claim."  (*See* Dkts. 126 at 20–21; 129 at 23; 134-2 ¶¶ 13–17; 136 at 13.)  And the Claim was made in September 2016, which was "during the Policy Period" of October 1, 2015–October 11, 2016. (Dkts. 134-2 ¶¶ 13, 62; 114-5 at 68.)  The result is inescapable: the ADEM lawsuit "include[d] a Pollution Condition [Colonial's gasoline leak] that result[ed] in a Claim [the EPA Notice] during the Policy Period [September 2016]."  And that means the lawsuit is not a Possible Claim.

Colonial has two arguments in response.  First, it "proposes a more logical reading of the Policy" that seeks to "dovetail" the *Possible Claim* exception with an exception to the definition of *Claim*.  (Dkts. 126 at 21; 136 at 13.)  The Possible Claim exception says "Possible Claim shall not include a Pollution Condition that results in a Claim during the Policy Period."  (Dkt. 114-5 at 30.)  The Claim exception says "Claim does not include a Possible Claim that was reported under a prior policy but which has become a Claim during the Policy Period of this Policy."  (Dkt. 114-5 at 27.)   Under Colonial's proposed reading, these provisions mean nothing more than the following: "If a Possible Claim reported during the policy period ripens to a Claim, it is now a full-fledged Claim and is no

11

longer a Possible Claim.  A Possible Claim reported during a prior policy period that ripens to a Claim during this policy is meant to be covered under the prior policy—not the current year's policy."  (Dkt. 136 at 13.) This may well be a good proposal.   But it is not the policy we have here. Colonial never really explains how its proposal hews to the actual text of the policy.  And the Court does not see how it does.  It certainly does not overcome the plain language of the policy that excludes ADEM's lawsuit from coverage.

Colonial's second argument fares no better.  It claims another provision in AIG's policy "contemplates coverage for multiple Claims arising out of a single Pollution Condition." (Dkt. 126 at 22.)[4]  That may be.  But it does not foreclose the Court's reading here.  Limiting *Possible* Claims does not preclude "multiple *Claims*."   The policy can allow "multiple Claims arising from a single Pollution Condition" and still

---

[4] The relevant provision says: "If the Insured first notifies the Company of a Claim or Emergency Response Costs during this Policy Period . . . , then all Claims or Emergency Response Costs arising from Each Incident that are reported to the Company under a subsequent Pollution Legal Liability Policy issued by the Company or its affiliate providing substantially the same coverage as this Policy, shall be deemed to have been first made and reported during this Policy Period." (Dkts. 114-5 at 16; 126 at 22.)

prohibit *Possible* Claims—like the one here—that have already resulted in a related Claim.  There is no inconsistency.

At the end of the day, the Court must apply the unambiguous text of the policy.  The text is clear that the ADEM lawsuit is not a Possible Claim.  So the Court grants summary judgment to AIG on this issue.

## IV.  Colony Policy

AIG also moves for summary judgment on its fourth affirmative defense and third-party complaint, which both claim AIG's coverage for the gasoline leak is excess of Colony's coverage.  The Court denies AIG's motion.

Colonial is insured by Colony as well as AIG.  (Dkt. 135-2 ¶ 37.) Both policies cover the gasoline leak.  (Dkt. 135-2 ¶¶ 38–39.)  And both policies say what happens when other insurance is available for the same loss.  The Colony policy says that, on the facts here, "this insurance will be primary and we will not seek contribution from any other insurance." (Dkt. 135-2 ¶ 16; *see* Dkts. 120-1 at 13–14; 121 at 8 n.11.)  The AIG policy has a more elaborate provision.  It says:

> If other insurance is available to the Insured for Loss covered by this Policy, the Company's obligations are limited as follows:

1.  Except as set forth in Paragraphs 3., 4. and 5. below, this insurance is primary and the Company's obligations are not affected unless any of the other insurance is also primary.  In that case, the Company will share with all such other insurance by the method described in Paragraph 2. below.

2.  If all of the other insurance permits contribution by equal shares, the Company will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.  If any of the other insurance does not permit contribution by equal shares, the Company will contribute by limits.  Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

3.  This insurance shall apply as excess insurance over the Scheduled Underlying Insurance listed at the end of this Endorsement and any renewals or replacements thereof, provided, however that this insurance shall be primary as described in Paragraphs 1. and 2. above where any such policy in the Schedule of Underlying Insurance below and any replacements or renewals thereof do not provide primary coverage to the Insured for Loss covered under the terms and conditions of this Policy. This excess insurance shall in no way be increased or expanded or drop down as a result of the receivership, insolvency, or inability or refusal to pay of any insurer with respect to both the duty to indemnify and the duty to defend.

4.  Where this insurance is excess insurance, the Company will pay only its share of the amount of Loss, if any, that exceeds the total amount covered by the other insurance.

> 5. Solely with respect to Clean-Up Costs, Claims or Loss arising in whole or in part from a Pollution Condition due to Microbial Matter and/or Legionella pneumophila, this insurance is excess of any other valid and collectible insurance. Where this insurance is excess insurance, the Company will pay only its share of the amount of Loss, if any, that exceeds the total amount of such other insurance.

(Dkt. 114-5 at 42–43.)

AIG claims it is the excess insurer here because its policy purports to be excess and Colony's policy purports to be primary. There is no doubt that Colony's policy does purport to be primary. So the only question is whether AIG's policy purports to be excess. AIG says that it does under the language in paragraph 4 quoted above. According to AIG, (1) paragraph 4 means AIG's coverage is excess if other insurance "express[ly] . . . operate[s] on a primary and non-contributory basis"; (2) the Colony policy purports to be primary and non-contributory here; so (3) paragraph 4 is triggered and AIG's coverage is excess under its own policy. (Dkt. 135 at 6–8.)

The Court rejects this argument. It asks far too much of paragraph 4. That provision simply says what happens "[w]here [AIG's] insurance is excess"; it does not identify the circumstances in which AIG's

15

insurance actually *is* excess.  Only paragraphs 3 and 5 do that.  The former says "[t]his insurance shall apply as excess insurance" over certain insurance identified elsewhere in the policy.  The latter says "this insurance is excess" for loss arising from "a Pollution Condition due to Microbial Matter and/or Legionella pneumophilia."  Neither paragraph applies to Colony's coverage for the gasoline leak.  (*See* Dkts. 114-6; 121 at 7–8.)  And, tellingly, neither paragraph looks anything like paragraph 4.  Paragraphs 3 and 5 declare directly that AIG's coverage "is" or "shall" be excess.  Paragraph 4 simply explains how much AIG will pay "[w]here" its coverage is excess.  Unlike the other paragraphs, it does not itself purport to establish excess coverage.

To be sure, paragraph 1 does say AIG's insurance is primary "[e]xcept as set forth in Paragraphs 3., 4. and 5."  But this preamble to a provision about primary coverage does not convert paragraph 4 into a stand-alone ground for excess coverage.  All it does is recognize the obvious: AIG's insurance is not primary "[w]here [AIG's] insurance is excess."  We still have to determine "where" that is so.  Only paragraphs 3 and 5 do that.  Paragraph 4 does not.  It certainly does not say anything about what happens when other insurance purports to be primary.  AIG's

16

argument to the contrary reads words into the provision that are simply not there.[5]

In sum, paragraph 4 does not establish that AIG's coverage is excess here. AIG's argument to the contrary is wrong. AIG's motion is based on that erroneous argument. So the Court denies AIG's motion.[6]

## V.   CECO's Motion to Strike

Finally, CECO (a maintenance contractor for Colonial) moves to strike two factual stipulations between Colonial and AIG on the ground that the stipulations are inaccurate. The stipulations essentially say "Colonial contends," and "[a] third-party analysis concluded," CECO's inadequate work caused Colonial's gasoline leak. (Dkt. 114 ¶¶ 6–7.) It

---

[5] The parties likely intended paragraph 4 to function as the final sentence of paragraph 3. That would make paragraph 3 consistent with paragraph 5, whose final sentence mirrors the language in paragraph 4. It would also make paragraph 3 consistent with another nearby provision, which says: "If a Claim covered under the policies listed below in the Schedule of Underlying Insurance . . . exhausts the limits of liability of such policy(ies), this Policy will only pay covered Loss in excess of the limits of insurance provided by such policy(ies)." (Dkt. 114-5 at 42.)

[6] AIG does not argue it would be entitled to summary judgment if its policy and Colony's policy *both* purported to be primary. (*See, e.g.*, Dkt. 135 at 6 ("[T]he Colony Policy provided Colonial with primary coverage exclusive of other insurance, *unless that other insurance also dictated that it applied solely on a primary basis*.") (emphasis added).) So that argument is not before the Court.

appears these stipulations are accurate as far as they go. (*See* Dkt. 132 at 6–9.) Rightly or wrongly, Colonial does make that contention. And a third-party analysis did reach that conclusion. At a minimum, CECO has not shown otherwise. But even if the stipulations were factually incorrect, CECO "cite[s] no authority suggesting how a non-party to [a] stipulation could be bound by it." *In re Vitamin C Antitrust Litig.*, 995 F. Supp. 2d 125, 128 (E.D.N.Y. 2014). Indeed, CECO cites authority suggesting the opposite. (*See* Dkt. 125 at 2 (citing *Phillips v. Mortg. Elec. Registration Sys., Inc.*, 2013 WL 1498956, at *4 n.5 (N.D. Ala. Apr. 5, 2013), which found plaintiffs were not bound by a stipulation where "there is no evidence the plaintiffs joined it or agreed to it").)

In the end, though, the Court need not decide whether CECO's motion has merit because the challenged stipulations are immaterial— at least at this juncture. The Court has not relied on them in this Order. And it has no plans to do so in the future. If the stipulations do become relevant, and if CECO continues to believe they should be stricken, CECO can ask the Court to intervene at that stage. In the meantime, the Court denies CECO's motion without prejudice.

18

## VI. Conclusion

Colonial's Motion for Summary Judgment (Dkt. 118) is **GRANTED** to the extent the Court concludes, as a matter of law, Colonial has paid the $10 million SIR required by the AIG policy.  It is otherwise **DENIED**. AIG's Motion for Summary Judgment (Dkt. 119) is **GRANTED** to the extent the Court concludes, as a matter of law, the AIG policy does not cover ADEM's 2018 lawsuit against Colonial.  It is otherwise **DENIED**. AIG's other Motion for Summary Judgment (Dkt. 120) is **DENIED**. CECO's Motion to Strike (Dkt. 125) is **DENIED WITHOUT PREJUDICE**.

The Court **ORDERS** this case to mediation.  The parties may retain their own mediator.  The expense of a retained mediator must be paid by the parties.  The parties may, alternatively, ask the Court to appoint a magistrate judge to conduct the mediation.  The parties are not required to pay for mediation by a magistrate judge.

The parties shall advise the Court of their mediation preference no later than thirty (30) days from the date of this Order.  If the parties elect to retain their own mediator, they shall identify the mediator no later than 45 days from the date of this Order.  Mediation must occur with 120

days from the date of this Order.  The parties must have present at the mediation a person with authority to settle this litigation.  The parties must also invite Steadfast Insurance Company—and any other non-party whose presence would materially increase the likelihood of a global settlement—to participate in the mediation.

The parties shall, within five days after the mediation, notify the Court in writing whether mediation resulted in a settlement of this action.

The Court **STAYS** this case pending mediation.  The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of the stay.

**SO ORDERED** this 23rd day of March, 2022.

_____

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE